## SCALES v. GRASSMAN et ux. (No. 8448.)*

(Court of Civil Appeals of Texas. Galveston. March 5, 1924. Rehearing Denied April 3, 1924.)

**1. Partnership** ⊝➡213(1)—**Cross-petition held to sufficiently plead partnership agreement.**

In action to quiet title to gin and grist mill plant, cross-petition *held* to sufficiently plead a partnership agreement and undertaking between the parties.

**2. Frauds, statute of** ⊝➡129(9)—**Interest in land transferred without writing, where transferee goes into possession and makes improvement.**

Statute of frauds has no application to a transfer of an interest in land where transferee went into possession and made valuable improvements thereon.

**3. Partnership** ⊝➡53—**Evidence held sufficient to show joint ownership of lands and business as partners.**

In suit to quiet title to gin and grist mill plant, evidence *held* to sustain a finding that the land on which the gin was situated was owned jointly by the plaintiff and defendant as partners, and that a partnership agreement was

entered into relative to the gin properties, and that defendant was not merely an employee.

**4. Appeal and error ⧆1011(1)—Judgment on conflicting evidence sustained.**

If evidence conflicts and supports judgment, it must be affirmed.

Appeal from District Court, Brazoria County; M. S. Munson, Judge.

Suit by J. H. Scales against John Grassman and wife. Judgment for defendants, and plaintiff appeals. Affirmed.

See, also, 261 S. W. 220.

Warren & Conn, of Houston, for appellant. Bryan, Dyess & Colgin, of Houston, for appellees.

LANE, J. This suit was brought by appellant, J. H. Scales, against appellees, John Grassman and wife, to quiet his title to a certain gin and grist mill plant, and for the issuance of an injunction to restrain Grassman and wife from interfering with him in operating said plant.

The plaintiff Scales alleged:

"That some time during the summer of 1917, the plaintiff and the said John Grassman entered into a verbal agreement by the terms of which plaintiff was to furnish the land or site for a cotton gin and grist mill and the lumber and machinery for building the necessary houses and erecting the necessary machinery for ginning and baling cotton and grinding corn and other things usually in connection with enterprises of like character; that by the terms of said agreement the said John Grassman was to furnish his labor and skill in erecting the necessary buildings and placing said machinery for the carrying on of said business and was to look after, manage, and operate said gin and grist mill, devoting his time, labor, and skill thereto, for a period of five years from said date; that as compensation to the said Grassman for his labor, skill, and time in managing and operating the gin and grist mill, the plaintiff agreed to pay to the said John Grassman in lieu of salary or wages, one-half of the net profits arising from the operation and conduct of said gin and grist mill for the period of five years; that in pursuance of said agreement he furnished the land, lumber, and machinery as stipulated in said agreement and the funds necessary to pay all additional help in erecting said gin and grist mill and improvements and additions made thereto and the said John Grassman assisted in placing said machinery in position and erecting the necessary buildings therefor."

Grassman and wife answered by general demurrer, general denial, and by their cross-petition alleged as follows:

"Further answering herein and by way of cross-action the defendant John Grassman respectfully shows to the court that in the summer of 1917 the plaintiff and said defendant entered into an agreement whereby they were to erect, own and operate the gin described in plaintiff's petition; that the defendant, under the terms of said agreement was to superintend the construction of said gin and give his own time and labor to the enterprise and that this he did do; that under the terms of said agreement the plaintiff was to furnish the land upon which the gin was to be situated and to pay for all cost of material that went into the construction of the same; the gin was then to be operated under the superintendency and supervision of the defendant Grassman, and for the years 1917, 1918, 1919, and 1920 the defendant did operate said gin; that under the terms of said agreement plaintiff and defendant were each to receive one-half of the profits of, and own a one-half interest in, the partnership enterprise."

In paragraph 4 of their cross-petition they described the land on which the plant was situated, and alleged that it had been bought by the plaintiff from John B. Warren on the 9th day of August, 1917, and the deed taken in the name of the plaintiff, but that it was bought for the benefit of both parties.

In the 10th paragraph they alleged that said land was purchased by the plaintiff for the partnership and that plaintiff held the title thereto, one-half for himself and the other half in trust for defendants.

By paragraph 5 they alleged:

"The defendant would further show that in 1917 he constructed a gin upon said hereinabove described property, giving his time, skill, and labor to the construction thereof; that the plaintiff furnished the material for the construction thereof, and that the gin was constructed upon the hereinabove described tract of land; that after the construction of said gin and during the years 1917, 1918, 1919, and 1920 the defendant operated said gin, supervised its operation, and managed and directed all operations in connection therewith, including the purchasing of cotton seed and the loading thereof upon the sale of same."

They then reiterated their allegation that John Grassman, by the terms of the partnership agreement, was to receive one-half of the net profits under the operation of the gin and all operations in connection therewith, and related thereto, and was to own a half interest in the gin and land on which it stood, and that Grassman had been at all times ready and willing to continue the operation of the gin under said agreement, and that the plaintiff had complete charge of the accounts of the partnership enterprise and had kept all the books used in keeping accounts relative to the operation thereof.

By paragraph 9 they alleged as follows:

"This defendant would further show that under the terms of said agreement as hereinabove set out between the plaintiff and the defendant, he is entitled to one-half of all the profits from the operation of said gin and that he is entitled to one-half interest in said hereinabove described gin and tract of land upon which the same is situated; and in the alternative, should the court hold that said agreement was void for any reason whatsoever, this defendant

would show that the relation existing between himself and the plaintiff was that of a valid and subsisting partnership, and that besides an accounting, this defendant is entitled to one-half interest in the hereinabove described tract of land, together with all improvements situated thereon, all of which property the plaintiff holds in his own name for himself and in trust for the defendant for the one-half interest owned by the defendant, and to a one-half of the profits realized from the operation of said gin since its construction."

Their prayer was as follows:

"Wherefore, premises considered, defendants pray the court that plaintiff take nothing by his suit and that the preliminary injunction heretofore granted be dissolved, and that plaintiff be required to account for the operations of said gin to the defendant, and upon final hearing hereof the defendant have judgment of the court declaring that a one-half interest in the hereinabove described property, gin and tract of land, is trust property and is held in trust by plaintiff for defendant John Grassman, and decreeing said defendants a one-half interest in said gin and the tract of land on which the same is situated, and for such other and further relief, both in law and equity, special and general, to which they may be entitled."

By supplemental petition the plaintiff specially excepted to all allegations of fact in the defendants' cross-petition, wherein they alleged a partnership agreement, upon the grounds that the gist of such allegations was to establish an interest in real estate belonging to plaintiff and did not allege that said agreement was in writing, and therefore the facts as pleaded and sought to be established were contrary to the statute of frauds pleaded by the plaintiff. He also demurred generally to the defendants' answer, and denied the facts alleged in the answer, and also denied under oath the partnership alleged by the defendants. All demurrers and exceptions of the plaintiff were overruled, to which ruling the plaintiff excepted.

Upon trial before the court without a jury judgment was rendered in favor of defendants on their cross-action against plaintiff for a one-half undivided interest in the gin and all buildings connected therewith and the small tract of land, 60 feet in length and 250 feet long, upon which the same is situated. The injunction theretofore granted upon the application of the plaintiff was dissolved. From the judgment so rendered J. H. Scales has appealed.

By his first assignment appellant insists that the court erred in not sustaining his general demurrer to appellees' cross-petition, in that the facts alleged are insufficient to establish a partnership between him and appellee, John Grassman, on which appellees relied to establish an interest in the land in controversy.

[1] This contention cannot be sustained. We have set out herein the material allega-tions of appellees' cross-petition. Allowing said petition every reasonable intendment, it appears to us to have sufficiently pleaded a partnership agreement and undertaking between the parties and that it was not subject to the general demurrer addressed to it.

[2] By his second assignment appellant insists that the court erred in overruling his special exception to all that part of appellees' cross-petition wherein it is alleged that appellant and John Grassman had entered into a partnership agreement to erect a gin upon the land in controversy, in that there are no allegations that said agreement of partnership was in writing, and the gist of said allegations being to establish an interest in real estate belonging to appellant, the same is contrary to the statutes of fraud, pleaded by appellant.

This contention cannot be sustained. It is in effect alleged in the petition that appellee John Grassman had, under the terms of an agreement had with appellant, taken possession of the premises in controversy as manager and part owner thereof, and that he had made valuable improvements thereon. We are therefore of opinion that the statute of fraud has no application to the case as made by the cross-petition.

The further contentions of appellant for reversal of the judgment may be shown as follows: Appellant contended that appellee John Grassman, under the terms of the contract entered into between him and appellant, was to receive one-half of the net profits of the enterprise as wages or salary, and was to own no interest in the plant itself.

Appellees contended, on the other hand, that the agreement was that the two parties were to be jointly interested in and owners of the properties constituting the plant; that the property was to be paid for out of the gross proceeds of the enterprise or business, and that the net profits, after paying expenses necessary in its operation and improvement, were to be equally divided between them; that appellant was to advance money for the construction and operation of the plant and business when necessary, and the appellee Grassman was to furnish the labor, time, and skill in constructing the plant and in managing the actual operation of the same; that appellant was to keep, and he did keep, the books, accounts, and moneys belonging to the business, and that all the properties composing the plant, including ginhouse, gin, engine, press, etc., and the land on which the gin was situated, was finally paid for out of the gross receipts or earnings of the common enterprise, such moneys as had been advanced by appellant having been repaid to him out of such earnings or gross receipts.

[3] Appellant now contends, first, that there was no evidence to sustain a finding that the land on which the gin was situated

was owned jointly by him and John Grassman as partners; and, second, that appellees failed to establish by a preponderance of the evidence that he and Grassman had entered into a partnership agreement relative to the gin properties; but, to the contrary, it was shown by the preponderance of the evidence, if not the whole evidence, that by the terms of the agreement between the parties John Grassman was to receive, as his full compensation for his services, one-half of the net profits of the business, that is, one-half of such proceeds after deducting therefrom the moneys expended in the purchase of houses, gins, and other machinery necessary to construct the gin plant, and after deducting also the expenses necessarily incurred in the operation of the plant.

We are unable to see that there is any conceivable merit in these last-mentioned contentions. It was shown that as appellant owned a mercantile establishment at the town or village of English and his attorney, J. B. Warren, owned a farm lying adjacent to said town, they wanted a gin and grist mill located at English; that, so desiring, they got in communication with appellee Grassman, a practical ginner, with a view of having him become interested in the proposed enterprise. Thereafter appellant and Grassman called on Warren to talk over the matter with him. Warren refused to participate in the erection of the plant, but agreed with appellant and Grassman that if they would erect the gin plant he would lease them the land, upon which it was later erected, for five years, reserving the privilege, however, to purchase the plant at cost in the event he should sell his farm. Thereafter Grassman told appellant Scales that one Hanna owned an old gin which he thought could be purchased at a bargain and proposed to appellant that, if he would furnish the money to buy the old gin, he (Grassman) would move and erect it on the land to be leased from Warren at English. Grassman testified that he told appellant that, if he (appellant) would furnish the money to purchase the Hanna gin, he (Grassman) would do all the work in removing and rebuilding it and that Scales could take out of the gross profits of the enterprise for five years all moneys he had advanced for the erection and maintenance of the plant; that Scales agreed to this proposal and he then purchased the Hanna gin, for which Scales paid $250 to $300, and moved and erected it upon the land leased from Warren; that after the removal and erection of the Hanna gin it was discovered that the engine which they had contemplated using was not sufficient to furnish the necessary power, and that another engine would have to be purchased; that he found a crude oil engine and he and Scales examined it and Scales agreed to buy it and did buy it.

Testifying further, he said that he insisted on getting the land from Warren; that he insisted that while they had it leased for five years, and while Warren would probably pay them for the machinery and material in the plant at the expiration of the lease, he might not be willing to pay the value of the labor in erecting the plant; that in the early part of 1918 Scales decided that they needed a larger gin plant and told him (Grassman) to make out an order for more machinery; that he made out the order requested and Scales purchased the necessary machinery called for by the order; that, before they purchased the new engine, Scales told him that if they could not get a proper settlement out of Warren at the expiration of the lease they could move the plant over on other land.

Testifying further, he said:

"There was an agreement or statement made to me by Mr. Scales at the time I first agreed upon the construction of a gin as to what my interest would be in the profits of the gin; it was to be 50 per cent. of the profits. He did not tell me at the time that that 50 per cent. I was to receive was to be in the place of my salary. He did not exercise any authority over me in reference to how the gin was to be run and in the construction of it; of course, he attended to all business matters and the shipment of seed—he got the price of the seed—what he was getting for seed and what to pay for them, and, of course, in the shipment of the seed, and attended to the money end of it. He attended to that—at least making out the bill of lading. I had associates with me in the construction of the gin; of course, they were under me—I superintended everything, and I also worked in the construction of it. I was the gin manager in the operation of the gin—looked after the machinery, kept it going, and weighing the cotton and cotton seed and figuring the seed, what they come to and was coming to each customer that ginned there, and in fact I was just general manager for the gin. The gin was constructed in 1917, and I operated it in that capacity from 1917 to 1920. Besides the ginning of cotton there, we also had a grist mill. We had nothing else besides, that in connection with the gin. The cotton seed was part of the gin business. As to whether I had anything to do with the seed besides just buying them—I either had the seed to go in the car or into the seedhouse when the cotton was ginned and when I got a carload in the seedhouse I usually hired the hands to load it in the car and sometimes I loaded it myself.

"Yes, sir; there was an agreement between me and Mr. Scales as to what my interest was to be; I was to own one-half interest in it until it was paid for. My one-half interest included everything; it included the building and the gin and whatever was made there. We would have to have some place for the gin to sit on. In my agreement with Mr. Scales I said that I was to have one-half interest in the gin. No, sir, I never at any time told Mr. Scales or he didn't ever tell me what was to be the interest of each in that gin—not after we first made our agreement. We did at the time

we first made the agreement. I don't think there was anything said at the time the first agreement was made as to what was to be the interest of myself and himself in that gin. I was to own a half interest when it was paid for. I stated a while ago that I was to receive a one-half interest in the profits. I think that agreement was made in 1917, in June or some time; it was made at the time the whole agreement was made with reference to the construction of the gin. The only different arrangement we made was when he borrowed—wanted to borrow $300, he said that he would do anything to help me out; that he didn't want the gin; he just wanted to help me out. As to whether there was any other agreement made between me and Mr. Scales as to how the gin was to be owned, the only thing, the way I put it up, he was to furnish the money and I was to do the work. I was to own half interest in the gin when it was paid for. At that time it only included the machinery and the building, because Mr. Warren had just give us the land free of charge for five years. There was no agreement as to who was to own the land after the land was purchased, if it was purchased."

On cross-examination he testified that from the beginning Scales had agreed that he should have a half interest in the gin when it was paid for; and, again:

"I said that I didn't have any cause to investigate to see if he had a deed to that land—didn't make any investigation until last year—until I fulfilled my agreement, and that agreement was to let the gin be paid for out of the proceeds of the gin, out of the earnings, not out of the profits, but out of the gross earnings. The half interest in the profits I was to get were to be the profits after taking from the gross earnings the expenses of operating the gin, labor, and the cost of the machinery that went in there and the ginning cost and the expenses of the buildings that were erected—to settle that and then with me."

Again:

"The only time that the question was ever mentioned about the interest I was to have in the profits was at the conversation at Sandy Point with Mr. Scales. At that time we didn't contemplate buying any land. I was expecting to get one-half of the profits for erecting and operating the business there   Part of it was to be my compensation for my labor and skill for putting in the gin, and part of it was to go into the business proposition. I agreed with Scales that I would put in my labor and time there in erecting and operating the gin and I was to have one-half of the profits."

After testifying as to the conversation with Warren with reference to the purchase of the Hanna gin, appellant Scales testified:

"I afterwards tried to buy that gin and put it on that land, that is, after talking with Mr. Grassman. As to what agreement and conversations I had with Mr. Grassman in reference to getting the gin and putting it on your place—well he agreed to do the work and put the gin and I would pay for it and would operate it for one-half of profits, and we come to see you

about the land, and you told us we could have it for a period of five years, and allow you the privilege of taking the gin over at cost at any time you saw fit to dispose of the land. * * *

"Yes, sir; I did buy the gin from Mr. Glenn Hanna. As to who made the purchase, whether Mr. Grassman or I, well, I guess we both talked to him about it; I paid for it. As well as I remember that gin cost me $300—$250 or $300—something like that."

It was shown that appellant purchased a new Muncie engine, which went into the gin plant, from T. L. Smith, for which he paid $1,500. Appellant testified that, as it became apparent that they had to buy the new engine and as he did not want to invest so much money on the land of Warren, he concluded to and did purchase the land on which the gin was situated from Warren for $200 and took the deed in his own name; that thereafter he purchased the new engine for $1,500; and that he purchased other machinery which went into the plant in 1918 at a cost of $2,507. In answer to questions propounded by the court, he testified as follows:

"As to whether the price paid for the two gins and the engine and the land was deducted from the gross revenues of the gin—the land had nothing to do with it; I made this business myself; I did deduct and figure that the gin was part of the expenses and took that out of the expenses and allowed the profits of the seed to go in as a profit. The amount I paid for the first gin and the amount I paid for the second gin and the engine, that was taken out of the proceeds of the gin, and I added the sale of the cotton seed to the proceeds of the gin; that was the way I figured it. No; I didn't take any money I paid for the engine out of the proceeds of the gin—none of it, but then that was the way I figured it. That was figured in as expenses and deducted before I made the settlement; I took the money out of my pocket to pay for the engine except what I borrowed from Mr. Grassman and I paid that back to him and the same way with everything else, except I paid for it myself. I paid for it out of my own pocket, and when I got the proceeds out of the gin I deducted the money from that and called it expenses."

The nature of contract and undertakings which would constitute the contracting parties partners is too well settled to require at our hands at this time a detailed discussion of them. It is sufficient to say that in our opinion appellees have alleged and proven by sufficient evidence the existence of a partnership in the present case, and that the only reasonable inference to be drawn from the evidence is that it was understood and agreed between Scales and Grassman from the beginning of their negotiations that Grassman was to own one-half of the gross earnings or accumulations of the gin plant after all advancements made by appellant Scales to said enterprise had been repaid therefrom. While the land and the machin-

ery were contracted and paid for by appellant, it is apparent from the evidence as a whole that such purchases were made .for the joint interest of himself and Grassman, for the whole purchase price was finally paid out of the earnings of the partnership enterprise.

We cannot, by any manner of reasoning, reach a conclusion from the evidence that John Grassman entered into an agreement with appellant whereby it was agreed that if appellant would advance the money to buy the Hanna gin and other moneys necessary to improve said property the same to be repaid out of the gross earnings of the enterprise, he would remove the gin to the leased land and thereafter give his time, labor, and attention to running the enterprise for one-half only of the net earnings of the plant, and at the same time agreed that appellant could, as he contends, under the agreement, use at his option any part or the whole of the earnings to build up a large and valuable plant on his own land in which Grassman was to own no part.

[4] If it be conceded, however, that the evidence with reference to the partnership was conflicting, it would be our duty to sustain the judgment of the court. In such cases we must look to the evidence tending to support the judgment, and if such evidence is sufficient to support the judgment it becomes our duty to affirm the same.

For the reasons pointed out the judgment is affirmed.

Affirmed.