Mrs. Gladys BLAIR, a feme sole, Appellant,

v.

Edith J. RINDY, Executrix of the Estate of Russell W. Rindy, Deceased, Appellee.

No. 13809.

Court of Civil Appeals of Texas.

Houston.

June 7, 1962.

Rehearing Denied June 28, 1962.

Sonfield, King, Sonfield & Smith, Robert L. Sonfield, Al L. Crystal, Houston, for appellant.

Tom Sullivan, Houston, for appellee.

BELL, Chief Justice.

Edith J. Rindy, the surviving wife of Russell Rindy, deceased, brought suit in her individual capacity and as executrix under the will of Russell Rindy, against Gladys Blair, seeking an accounting for partnership assets that appellant had sold and for certain unpaid profits. She alleged her deceased husband and appellant had been partners in G & B Vending Company prior to her husband's death. Appellant under oath denied the existence of a part-

nership and filed a cross-action alleging ownership in certain shares of stock in the Bellaire Investment Corporation which stood in the name of Russell Rindy. Appellee took a non-suit in so far as she sought recovery in her individual capacity and prosecuted the suit in her capacity as executrix.

On trial to the court without a jury the court found the existence of a partnership and rendered judgment in favor of appellee for $10,575.94, together with 6% interest from July 9, 1957, the date being that on which Mr. Rindy died. The court also rendered judgment awarding appellant 240 shares of stock in the Bellaire Investment Corporation subject to the payment of $1250.00 which she admitted owing.

■ There was no direct proof of the nature of the business relation between Mr. Rindy and his sister, Mrs. Blair. He was deceased and she was of course prevented from testifying to transactions between them because of the dead man's statute. The court was left to determine whether a partnership existed purely on a basis of circumstantial evidence. Of course partnership may be proven by circumstantial evidence, as may any other fact. Miller v. Laughlin, Tex.Civ.App., 147 S.W. 711, writ ref.

■ The testimony shows that the latter part of 1953, the concession for dispensing cold drinks, etc., through vending machines located in various Interstate Theatres in Houston, was available as a change was to be made by the theatre owners in operators of the concession. Mr. Rindy, who was manager of the Tower Theatre, contacted a Mr. Mason who was a friend of his and who was connected with Vend-A-Drink, which company had operated the concession. Mr. Rindy wanted to know about the value of the concession because he said his sister, Mrs. Blair, was moving here from California and he wanted to help her get into a business to earn a living since her then income was limited. Mr. Rindy seems

to have carried on all negotiations for the purchase of the machines from Vend-A-Drink. It does appear that Mr. Mason, representing a company selling automatic dispensing machines, made an analysis of what would be required to carry on the proposed operation. He addressed the report to Mrs. Blair on November 19, 1953. So far as we are able to find from the record Mrs. Blair never personally entered into the negotiations for the purchase of the machines. Mrs. Blair testified she got the concession through Mr. O'Donnell, the vice-president and general manager of Interstate. Apparently originally the concession was granted orally. Later, in September, 1956, the arrangement was put in writing, the letter making the proposal being addressed to G & B Vending Company, and was approved for the company by Mrs. Blair. The capacity in which she approved it is not shown. At the time Mr. Rindy, in the latter part of 1953, was negotiating for the purchase of the machines there was owing to Heller Company of Chicago on them a balance of $4766.89. Vend-A-Drink agreed with Mr. Rindy to sell the machines for $14,300.00. On December 7, 1953, Rindy borrowed money from the Bellaire State Bank. The minutes of Vend-A-Drink show the vote to sell the machines to Rindy and Blair as partners. We do not regard this recital of partnership competent as evidence of partnership because other evidence shows Rindy told them to make the sale in this manner. There being nothing to show Mrs. Blair knew of it, it was purely hearsay as to her. Rindy told Vend-A-Drink to have Heller Company draw a draft on him at the First State Bank of Bellaire for the balance owing. Mason wired such instructions to Heller Company. Apparently this was done as the chattel mortgage on the machines was released and there is no showing that Vend-A-Drink ever paid the amount or that Mrs. Blair ever paid Heller Company. On December 28, 1953, Mrs. Blair borrowed $14,000.00. She deposited the money in the name of G & B Vending Company. This

note was signed by her and Mr. O'Donnell. During December various checks were issued to Vend-A-Drink. Some were signed by Mrs. Blair and some by Mr. Rindy. These checks were for the purchase price of the machines, less what was paid Heller Company, and inventory. The payments aggregate $10,556.65. Add to this amount the $4,766.89 paid Heller Company and the payments aggregate $15,323.54. The price of the machines was $14,300.00, so that there were payments of more than the $14,000.00 borrowed by Mrs. Blair. Where this came from, unless it is a part of the draft paid Heller Company, is not shown definitely, but such is a reasonable conclusion that the trial court could draw.

The note of G & B Vending Company was payable in monthly installments of $611.10 beginning in February, 1954, with a final installment due January 5, 1956. Payments, as specifically shown by the record to November 10, 1954, indicate a reduction of the principal to $8,318.78. Mrs. Blair testified that the money was repaid out of "proceeds" from G & B Vending Company. She did not say from her share of the net profits.

It appears that the company operated out of an office on Missouri Street at first. Later a lease was taken on a place on Rosine Street. The lease was negotiated by Mr. Rindy. He took it in his name d/b/a G & B Vending Company. Mrs. Blair testified she had never seen the lease. We do not deem it of significance that Rindy took the lease in his name because it would be hearsay as to Mrs. Blair. We do, however, deem it of significance that Rindy negotiated the lease and Mrs. Blair by making use of the leased property recognized the exercise by Rindy of authority to exercise a measure of control over the business through handling this important item of business.

Too, Rindy negotiated a service contract for the business for one year with Mr. Mason. The contract was oral. The effect of the contract, as we garner from the record, was that the operation was largely carried on by Mason. Here again was an exercise of important control by Rindy which Mrs. Blair recognized through accepting the benefits.

The assumed name record shows Gladys Blair d/b/a G & B Vending Company. Who actually had it thus registered does not appear.

From Mr. Frisk, the accountant for the company, we learn about how it came about that he prepared the company income tax returns on a partnership return. Mr. Frisk, who knew Rindy and who had done accounting and bookkeeping work for Mason, was hired by Rindy. It was about a year after he was hired before he ever saw Mrs. Blair. He testified he got his information from both Mr. Rindy and Mrs. Blair. As to the division of the profits as shown on the partnership returns filed for 1955 and 1957, which are the only ones in the record, it is shown that Mrs. Blair received 70% and Mr. Rindy received 30%. It is also shown that Mrs. Blair gave 100% of her time to the business and Mr. Rindy gave 50% of his time. While returns for 1954 and 1956 are not in the record, Mr. Frisk said they were prepared in the same manner and division was on the same basis. Mr. Frisk testified the arrangement between Mr. Rindy and Mrs. Blair was that "each was to contribute their time and effort to the business and to be compensated on some basis, and the basis was 70–30 per cent. That basis being determined, as presented to me, according to the time spent that they had available to put into the business. All returns were filed on that basis, as I recall, on the amount of time, reflecting the amount they would receive from the business in the way of profit distribution." While it will be seen this does not expressly state net profits, the partnership returns shown in the record show net profits as determined for income tax purposes. In this connection it is to be noted that before the determination of net profits a deduction was made for depreciation of the company's property. The result is, or at least it is

a reasonable inference that could have been drawn by the trial court, that this resulted in Rindy in effect paying for 30% of the cost of the property. We are not unaware that it could also have been their agreement as to the method of determining net profits. However, when it is considered that if there were no partnership the same could be shown on an individual return of Mrs. Blair less 30% of the profits to Mr. Rindy, the fact of using a partnership return is evidence of intent to form a partnership. The returns also show salaries paid other than to partners. Then Mrs. Blair and Mr. Rindy are listed as partners.

A balance sheet prepared as of July 9, 1957 for G & B Vending Company following Mr. Rindy's death shows the balance owed the National Bank of Commerce on the note above discussed carried as a liability of the company and this is considered in determining Mr. Rindy's net worth in the company.

■ We have reached the conclusion that there is sufficient evidence to support the trial court's finding of partnership. There is really no substantial dispute in the evidence. The differences between the parties lie in the inferences they seek to draw from the evidence.

■ We in effect have an agreement that the net profits will be divided on the basis above stated. We think it significant that the percentage of profits provided for did not vary depending on the exact time each should work, but a reasonable inference is that the division was agreed to in advance to cover such time as was worked, though it might vary from time to time. For an interest in the net profits to establish a partnership the interest in the profits must be owned by the parties as principals. If the profits are merely the measure of compensation to an employee, or rental or like matters, no partnership is created. This is, of course, well established. Paggi et al. v. Quinn, Tex.Civ.App., 179 S.W.2d 789, writ ref.; Tanner v. Drake, Tex.Com.App., 124 Tex. 395, 78 S.W.2d 162.

■ While mere stipulation for sharing of net profits does not establish partnership, it is evidentiary of the existence of partnership. Southern Surety Co. v. Texas Employer's Ins. Ass'n, Tex.Civ.App., 2 S.W.2d 310, writ ref.; Roberts v. Nunn, Tex.Civ.App., 169 S.W. 1086, writ ref.; Davis v. Gilmore, Tex.Civ.App., 244 S.W.2d 671, ref.

It is, therefore, a very material consideration that there was a sharing of the profits. Too, a partnership income tax return was filed for 1954, 1955 and 1956. Also a like return was filed covering the portion of the year of 1957 up to the death of Mr. Rindy. If there were no partnership it would have been unnecessary to file such a return. We note that Mr. Frisk indicated he filed this type of return because it was as good a way as any to handle it. However, the court could reasonably draw a different conclusion from the facts. The machines were paid for from the proceeds of the business because the loan from the bank used in part to pay for them was repaid from such proceeds. See Scales v. Grassman, Tex.Civ.App., 261 S.W. 215, writ ref.

■ Another factor that is of importance is the manner in which the parties have exercised control over the business. The evidence reflects that Rindy did all of the negotiating for the purchase of the machines; he signed some of the checks in payment for them, though the money deposited in the company's name was borrowed money; he negotiated for the lease on Rosine Street, and he negotiated the contract with Mason covering a one year period when Mason, or his company, carried on the operation for the company. Power or authority over the business is an important ingredient of partnership and may be inferred from sufficient exercise of such authority. Holliday v. Taylor, Tex.Civ.App., 249 S.W.2d 941, ref., n.r.e. In the case before us it appears that very important items of the business were handled solely by Rindy and the benefits from the exercise of such control were knowingly accepted by Mrs. Blair.

Considering the whole record, the trial court could reasonably conclude that the 30% of the profits was owned by Rindy as a principal in the business and did not come to him as compensation for salary or wages.

Appellant urges that the court erred in finding she did not account to the executrix, because she says the evidence shows she made the books available and through her attorney Mrs. Rindy petitioned the Probate Court for an order approving her acceptance of unpaid profits in the amount of $2,241.31 and that such order was entered. It is to be noted that this related not to Rindy's interest in the partnership assets, but only to unpaid profits. Mrs. Blair denied partnership. Too, we have been unable to find where this amount was ever paid. Too, it covered only undrawn profits to the date of Rindy's death.

The court did not, as urged by appellant, find the book value of the assets. He found the reasonable market value, which is the proper measure. There was testimony by Mr. Mason, who was an expert in the field and who was personally familiar with the G & B Vending business, that its reasonable market value was $50,000.00. Appellant actually sold the assets for $30,000.00 and the court gave recovery for 30% of this.

Appellant complains that the trial court erred in not awarding her ownership of 360 shares of stock in the Bellaire Investment Company, subject to her payment of $1250.00 which she admits she owes on the purchase price. The stock purchase was not a part of the partnership business above discussed.

■ After a very careful study of a very confusing record, we have reached the conclusion that instead of 240 shares, appellant showed she was entitled to 280 shares. In March, 1955, Mr. Rindy purchased 10 shares of stock in the Investment Company. He paid for it in full by his personal check payable directly to the company. About five months later he bought 10 more shares and paid for part

of it. There was then a stock split of 2 shares for one. This would mean he now has 20 shares in place of the first 10 purchased. There was later an 8 for one split which would mean he now has 160 shares in place of the original 10 shares purchased.

The second purchase of 10 shares was partially paid for in August, 1955, and there was a stock split of 2 for one. It appears that Mrs. Blair issued checks between August, 1955 and January, 1956 showing she paid for half of the second purchase. This would mean she in January, 1956 owned 10 shares of stock. In January, 1956, Russell Rindy borrowed $5,000.00 at the First State Bank of Bellaire and pledged 70 shares of stock of the Investment Company. It is apparently conceded this was given in purchase of 50 shares. Checks given from time to time by Mrs. Blair establish the 50 shares were purchased for her and Mr. Rindy. The result is that she owned 25 of these 50 shares and she owned 5 shares of the second purchase which became 10 shares because of the split, so she owned 35 shares. There was an 8 for one split, which would give her a total of 280 shares. The original 10 shares, which we think the evidence showed Mr. Rindy solely owned, have now become 160 shares. The second 10 shares purchased, which we think the evidence showed belonged to Blair and Rindy equally, so that Rindy owned 5 shares, became 10 shares to Rindy on the 2 for one split, and on the 8 for 1 split became 80 shares. On the 8 for 1 split of his ½ of the 50 shares he owned 200 shares in place of his 25 shares. This makes a total for Rindy of 440 shares.

The judgment of the trial court must be and is hereby reformed so as to award to appellant 280 shares of stock in Bellaire Investment Company, subject to her payment of $1250.00.

The judgment of the trial court as reformed is affirmed, Associate Justice Coleman not sitting.